**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CELENA MORRISON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA,<br>VANESSA GARRETT-HARLEY,<br>ANGELA GRADY,<br>TIFFANY THURMAN,<br>and KATHLEEN LONIE,<br>Defendants. | Civil Action No. 2:26 -cv-08114<br><br>**JURY TRIAL DEMANDED** |

# <u>COMPLAINT</u>

## PRELIMINARY STATEMENT

1. Plaintiff Celena Morrison ("Plaintiff" or "Ms. Morrison"), by and through her counsel, hereby brings the instant Complaint against Defendant City of Philadelphia (the "City"), Defendant Vanessa Garrett-Harley ("Garrett-Harley"), Defendant Angela Grady ("Grady"), Defendant Tiffany Thurman ("Thurman"), and Defendant Kathleen Lonie ("Lonie"), each individual Defendant sued in her individual capacity, for their roles in the discrimination, harassment, and retaliation that culminated in Ms. Morrison's discharge from her position as Executive Director of the Mayor's Office of LGBT Affairs. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and § 2000e-3(a), et seq. ("Title VII"), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as

enforced through 42 U.S.C. § 1983, and the Pennsylvania Human Relations Act, 43 P.S. § 955 ("PHRA"). In support of the Complaint, Ms. Morrison states as follows:

## JURISDICTION AND VENUE

2. This Court has jurisdiction over these proceedings under 28 U.S.C. § 1331, which provides for original jurisdiction in the United States District Courts for civil actions arising under the Constitution or laws of the United States. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), et seq., and 42 U.S.C. § 1983.

3. This Court's jurisdiction is also invoked pursuant to 28 U.S.C. § 1343(3)-(4), which grants the District Courts original jurisdiction over civil actions to redress the deprivation, under color of state law, of rights secured by the Constitution and laws providing for equal civil rights.

4. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims herein, including Plaintiff's claims under the PHRA, as they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims herein, or a substantial part thereof, occurred in this judicial district. Venue is also proper in this judicial district under 28 U.S.C. § 1391(c) because Defendants may be found in this district.

## PARTIES

6. Ms. Morrison is a resident of Pennsylvania, residing at 1312 S 30th Street, Philadelphia, Pennsylvania 19146.

7. Defendant City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal offices located at 1400 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19107.

8. Defendant Vanessa Garrett-Harley is an adult individual who, at all times relevant hereto, served as Chief Deputy Mayor of the City of Philadelphia. Garrett-Harley is sued in her individual capacity. At all times relevant hereto, Garrett-Harley acted under color of state law.

9. Defendant Angela Grady is an adult individual who, at all times relevant hereto, served as Human Resources Manager in the Office of Mayor Cherelle L. Parker of the City of Philadelphia. Grady is sued in her individual capacity. At all times relevant hereto, Grady acted under color of state law.

10. Defendant Tiffany Thurman is an adult individual who, at all times relevant hereto, served as Chief of Staff to Mayor Cherelle L. Parker of the City of Philadelphia. Thurman is sued in her individual capacity. At all times relevant hereto, Thurman acted under color of state law.

11. Defendant Kathleen Lonie is an adult individual who, at all times relevant hereto, served as the Human Resources representative for the Office of the Mayor of the City of Philadelphia and, by November 2024, as Director of Administrative Services in the Mayor's Office. Lonie is sued in her individual capacity. At all times relevant hereto, Lonie acted under color of state law.

12. The City, at all times material hereto, acted by and through its agents, apparent agents, ostensible agents, servants, employees, and/or representatives, including Garrett-Harley, Grady, Thurman, and Lonie, who were acting in the course and scope of their respective agency or employment and/or in the promotion of the City's business, mission, and/or affairs.

13. The City, at all times material hereto, qualifies as Ms. Morrison's employer pursuant to Title VII and the PHRA.

14. Garrett-Harley, Grady, Thurman, and Lonie are referred to collectively as the "Individual Defendants." Upon information and belief, each of the Individual Defendants held supervisory or managerial authority within the Office of the Mayor, and each is a "person" subject to liability under Section 5(e) of the PHRA, 43 P.S. § 955(e).

**ADMINISTRATIVE PROCEDURES**

15. Ms. Morrison filed a Charge of Discrimination alleging sex (including gender identity) discrimination and retaliation against Defendant City under state and federal law with the District Office of the Equal Employment Opportunity Commission ("EEOC"), Charge No. 530-2025-02347, on January 12, 2025.

16. Pursuant to Section 7(c) of the Pennsylvania Human Relations Act, the Pennsylvania Human Relations Commission ("PHRC") has designated the EEOC in the Work Sharing Agreement as its agent for receipt of complaints initially filed with the EEOC that are dual-filed with the PHRC, and Ms. Morrison's Charge was dual-filed accordingly.

17. The first Charge identified Grady, Lonie (spelled both "Lonie" and "Lonnie"), and Thurman by name and described their conduct in its particulars. Garrett-Harley's role in the conduct at issue was unknown to Ms. Morrison until the July 2026 filing of the Anderson Complaint described below. As Chief Deputy Mayor, Garrett-Harley shares a commonality of interest with the City, and, upon information and belief, she received notice of the first Charge through the City and suffered no prejudice from her omission from it.

18. Ms. Morrison received a Notice of Right to Sue from the EEOC on Charge No. 530-2025-02347. A copy of that Notice is attached hereto and marked as Exhibit A.

19. On October 2, 2026, Ms. Morrison filed a second Charge of Discrimination against the City with the EEOC, Charge No. 530-2027-00082, to protect her rights as to information she first learned in July 2026 concerning the allegations of the Anderson Complaint described below. The second Charge identifies retaliation as its basis and alleges in its particulars that the City discriminated against Ms. Morrison because of her sex (gender identity) and retaliated against her for opposing discrimination.

20. On October 8, 2026, the EEOC issued Ms. Morrison a Notice of Right to Sue on the second Charge. A copy of that Notice is attached hereto and marked as Exhibit B.

21. Upon information and belief, the second Charge was dual-filed with the PHRC. Because less than one year has passed since the second Charge was filed, Ms. Morrison does not assert in this Complaint any claim under the PHRA that depends on the second Charge, and she reserves the right to amend upon exhaustion.

22. More than one year has elapsed since the first Charge was dual-filed with the PHRC.

23. Ms. Morrison has satisfied all administrative prerequisites to suit on her Title VII and PHRA claims and files this Complaint within ninety (90) days of her receipt of the Notices of Right to Sue.

24. Ms. Morrison's claim under 42 U.S.C. § 1983 does not require exhaustion of administrative remedies as a prerequisite to suit.

## OPERATIVE FACTS

25. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

26. This case arises from a pattern of sex and gender identity discrimination and retaliation that the City directed at Ms. Morrison, an African American transgender woman, following the start of the Parker administration in January 2024, and that culminated in her termination on November 21, 2024, one day after she submitted a written complaint documenting that discrimination and harassment to the City's Human Resources representatives.

27. As set forth below, Ms. Morrison was subjected to unwelcome comments about her appearance, non-consensual disclosure of her transgender status, invasive questioning about her body and medical history, and efforts by her superiors to isolate and discredit her, each motivated by her sex and gender identity and by her advocacy on behalf of other LGBTQ+ City employees. When Ms. Morrison reported this treatment to Human Resources, the City did not act to address it. Instead, within one day of her most recent written report, the City terminated her employment, citing a justification unsupported by any documented performance issue.

**Ms. Morrison's Background and Service to the City**

28. Ms. Morrison is an African American transgender woman.

29. In March 2020, the City hired Ms. Morrison as Executive Director of the Mayor's Office of LGBT Affairs.

30. Prior to her tenure as Executive Director, Ms. Morrison served as a Commissioner on the Philadelphia Commission on Human Relations from 2017 to 2020, where she investigated

complaints, addressed discriminatory practices, and implemented solutions promoting fairness and equity.

31. Throughout her employment with the City, Ms. Morrison received no disciplinary actions and consistently received positive feedback regarding her work performance. In her role, Ms. Morrison led the City's efforts to promote equity, visibility, and inclusion for LGBTQ+ individuals across Philadelphia, and frequently served as a point of support for LGBTQ+ City employees who experienced workplace discrimination.

32. It was against this record of unblemished service that the discriminatory and retaliatory treatment described below began.

**A Change in Administration Brings Escalating Harassment and Discrimination**

33. Each of the incidents described below reflects the hostility toward Ms. Morrison's gender identity, and toward her advocacy for transgender and non-binary employees, that intensified once the new administration took office in January 2024.

34. The pattern began even before the new administration took office. In mid-November 2023, while attending a press conference held by then-Mayor-elect Cherelle Parker, a male member of Mayor-elect Parker's security detail looked Ms. Morrison up and down and stated words to the effect of, "Damn, you look good." As a result of this harassment, Ms. Morrison felt an immediate sense of discomfort and unease. She thanked the officer and moved further into the room to distance herself from him, but the interaction unsettled her and heightened her apprehension about how she would be treated by the incoming administration.

35. Approximately one week later, Ms. Morrison reported this encounter to her DEI team, and then to her supervisor at the time, and expressed concern about potential challenges with the incoming administration.

36. This harassment escalated into intimidation during the transition to the new administration. On or about November 25, 2023, Ms. Morrison encountered an unknown man standing outside her office door. The man's intimidating demeanor and invasive questioning about whether it was her office caused Ms. Morrison to leave the area and hide in a restroom for an extended period. Ms. Morrison reported this harassment to Lonie, then the Mayor's Office Human Resources representative.

37. With the new administration in place, reports of gender-based discrimination against City employees increased significantly, and efforts by Ms. Morrison's office to support transgender and non-binary employees were met with accusations that her office was "overstepping."

38. Throughout the Parker administration, Ms. Morrison repeatedly raised concerns about the harassment and discrimination against transgender and non-binary City employees and requested that the City provide training to address it. Several supervisors flatly refused, telling her that they were "not doing that they/them thing." Ms. Morrison and members of the City's DEI leadership were also asked to step out of meetings.

39. Early in the Parker administration, while Ms. Morrison was advocating on behalf of non-binary athletes participating in City-sponsored races, Thurman, the Mayor's Chief of Staff, told Ms. Morrison that the Mayor viewed her commitment to the LGBTQ+ community as a hindrance to the administration.

40. At the same time, Ms. Morrison's direct supervisor at the time, Chris Dailey, instructed her to follow what was described as the "head down model," under which the administration maintained a stated practice of avoiding putting matters in writing.

41. Ms. Morrison's own gender identity soon became a direct target. In late March 2024, while Ms. Morrison was preparing for a Transgender Day of Visibility event, she overheard a member of the Mayor's security personnel disclose her transgender status to another City employee without her consent. This individual was a different person from the City employee referenced in paragraph 42 below.

42. In or around May 2024, Ms. Morrison reported to Lonie, then the Mayor's Office Human Resources representative, that she had experienced sexual advances from another City employee. Because of the harassment and intimidation she had already endured, and because the individual had close ties to the Mayor, Ms. Morrison feared retaliation and did not feel safe disclosing his identity.

43. Mayor Parker thereafter issued Executive Order No. 13-24, which reduced the authority of Ms. Morrison's office and her ability to carry out her duties as Executive Director.

44. The invasive scrutiny of Ms. Morrison's gender identity continued into the final weeks of her employment. In late October 2024, Ms. Morrison again encountered the same unidentified man who had previously stood outside her office. On this occasion, he questioned Ms. Morrison's appointment to the City's LGBTQ+ Commission and asked invasive questions regarding whether she had undergone gender-affirming surgery.

**A New Supervisor and Continued Isolation**

45. On October 11, 2024, the Mayor appointed Brandee Anderson as Chief DEI Officer, who thereafter became Ms. Morrison's direct supervisor.

46. Rather than receiving support from her new supervisor, Ms. Morrison instead experienced further isolation. Following Anderson's appointment, Ms. Morrison repeatedly sought guidance regarding the direction of the Office of LGBT Affairs. Scheduled check-in meetings with Anderson were repeatedly rescheduled and then canceled.

47. Ms. Morrison arranged a meeting with Anderson on or about November 15 or 16, 2024, in order to obtain guidance. During this meeting, Anderson told her that Thurman had been speaking negatively about Ms. Morrison in meetings. Anderson further stated that City leadership viewed Ms. Morrison as a "rogue" employee, despite there being no criticism of her actual job performance. The "rogue" label referred to nothing more than Ms. Morrison's attendance at events, including routine ones, to represent the City, the same function she had performed without objection under the prior administration.

48. Distressed by this conversation, Ms. Morrison became emotional and stated that the situation made her "feel like throwing it all away," referring to her employment. Rather than addressing the seriousness of this situation and what was going to be done to curb Thurman's unwarranted behavior, Anderson responded with words to the effect of, "But you look fabulous." As Ms. Morrison attempted to leave, Anderson followed her to the door, stated words to the effect of, "I want to give you a hug," and embraced her.

49. Ms. Morrison was not alone in experiencing this treatment. On November 17, 2024, a coworker, Brenna Schmidt, informed Ms. Morrison that she had experienced a substantially similar interaction with Anderson, including disparaging comments followed by an unsolicited

hug. Ms. Morrison then realized that Anderson's remark and embrace were not intended to comfort Ms. Morrison, but to manipulate her.

**Hostile Work Environment**

50. None of the conduct described above was welcomed or invited by Ms. Morrison, and each incident of harassment was directed at her because of her sex and gender identity. The comments and scrutiny directed at her physical appearance, the non-consensual disclosure of her transgender status, the invasive questioning about whether she had undergone gender-affirming surgery, and the belittling treatment by her own supervisor each targeted the fact that she is a transgender woman.

51. This conduct was neither isolated nor incidental. Over the approximately twelve months between the security detail's comment in November 2023 and her termination in November 2024, Ms. Morrison was subjected to a continuous and escalating pattern of unwelcome conduct by at least five different individuals connected to the City, including comments on her physical appearance, physical intimidation that caused her to hide in a restroom, non-consensual disclosure of her gender identity, invasive questioning about her body and medical history, dismissive treatment of her harassment report, and unwanted physical contact and belittling remarks from her own supervisor. The frequency, duration, and escalating character of this conduct, moving from comments about her appearance to direct interrogation about her anatomy, made the environment increasingly hostile and abusive.

52. This conduct had an adverse impact on Ms. Morrison's employment. She avoided or cut short interactions in her own workplace, including hiding in a restroom to avoid the man who confronted her outside her office. She remained unwilling to disclose the identity of the individual

who had made sexual advances toward her for fear of retaliation and in the absence of any assurance of protection. She was left in tears and emotionally distraught following her November 2024 meeting with her supervisor. And she was increasingly isolated from the guidance and support she needed to carry out her duties as Executive Director of the Office of LGBT Affairs. Throughout this period, Ms. Morrison worked in a constant state of apprehension, forced to smile through the mistreatment while fearing that she would be disciplined, which made it increasingly difficult for her to carry out her duties.

53. The City had actual notice of this hostile environment and failed to take prompt or effective remedial action. Ms. Morrison reported harassment to Lonie in May 2024, and, as discussed further below, to Grady and Lonie on November 19, 2024, and again in writing on November 20, 2024. On information and belief, the City never investigated or identified the individual who made sexual advances toward Ms. Morrison, never addressed the non-consensual disclosure of her transgender status, and never took any corrective action in response to any of her reports. Rather than respond to her reports, the City terminated her employment one day after her final written complaint.

54. The cumulative effect of this unwelcome and discriminatory conduct, left unaddressed by the City despite actual notice, was to create a hostile and abusive working environment for Ms. Morrison because of her sex and gender identity.

**Misrepresentation of Statements and Termination**

55. On November 19, 2024, rather than addressing the discrimination and harassment Ms. Morrison had reported, Grady and Lonie arrived unannounced at Ms. Morrison's office to question her about an alleged "threat of violence," referencing Ms. Morrison's earlier statement that she felt like "throwing it all away." When they entered, Ms. Morrison asked whether she was being fired.

Both answered no, and Grady added, "Absolutely not." Ms. Morrison clarified that her statement reflected her desire to resign in light of the ongoing discrimination and harassment she had experienced, not any threat of harm, and again described the discrimination, harassment, and non-consensual disclosure of her gender identity that she had previously reported.

56. On November 20, 2024, at 7:58 a.m., Ms. Morrison sent Grady a written follow-up to the November 19 meeting, copying Lonie, under the subject line "Follow-Up on Workplace Concerns." In that email, Ms. Morrison reported that around May 20, 2024, she told Lonie that another City employee had subjected her to inappropriate sexual advances, and that she withheld the individual's name because of the individual's close connection to the Mayor and her fear of retaliation. She reported that since January 2024 she had experienced a marked increase in discriminatory behavior, including sexual advances, being outed as a transgender woman by a City employee, and intrusive questions about her transition, including whether she had undergone bottom surgery, and that these incidents of harassment had created a hostile and unsafe work environment. She further reported that Anderson's conduct toward her, which she described as persistent gaslighting with anti-trans undertones, had affected her sense of safety at work, and she asked that a third party be present at any future meeting with Anderson.

57. Later that day, Grady telephoned Ms. Morrison, without responding in writing to her email, and directed her to appear for a meeting the following morning at 9:00 a.m.

58. On November 21, 2024, at the meeting Grady had directed her to attend, Garrett-Harley, Grady, and a Human Resources representative known to Ms. Morrison as "Candy" informed Ms. Morrison that the City was terminating her employment, without providing any explanation or

reason for the decision. The City confirmed the termination by letter signed by Grady as HR Manager and immediately cut off Ms. Morrison's access to her City email account.

59. Ms. Morrison's termination occurred one day after she submitted her written complaint of discrimination and harassment to the City's Human Resources representatives.

60. The termination letter did not identify any performance deficiencies, disciplinary history, or specific incident of misconduct. Instead, the letter stated that Ms. Morrison's "actions are not indicative of the leadership and conduct desired for this role," that she had "engaged in communication that has undermined confidence in [her] ability to communicate constructively and professionally," and that her "behavior, communication and professionalism do not consistently align with those of the Administration." The letter further asserted an "untenable incompatibility" between Ms. Morrison's work and "the City's expectation" that would "undermine the effectiveness of the Office of LGBTQ+ Affairs."

61. The City's stated reason for termination was pretext to remove Ms. Morrison in retaliation for her repeated reports of discrimination and harassment, and because of her sex and gender identity.

**Similar Treatment of Other City Employees**

62. Ms. Morrison was not the only employee affected. On information and belief, other transgender and non-binary employees of the City experienced similar discriminatory treatment during the same period, and several sought support from her in her capacity as Executive Director of the Office of LGBT Affairs.

63. Between January 2024 and her termination, Ms. Morrison's office received approximately fifteen to twenty reports of workplace discrimination from City employees across City departments, including the Fire Department, the City's public libraries, the City's airports, and the Health Department, by email, telephone, and in person, which, when appropriate, were referred to the Philadelphia Commission on Human Relations.

64. By the time Ms. Morrison reported the sexual advances to Lonie in May 2024, she was largely isolated in an office far from most Mayor's Office and DEI staff, and the colleagues in whom she had confided about the harassment she experienced had been terminated or had resigned. At least five employees resigned from the Parker administration because of the hostility they experienced.

**Confirmation of Retaliatory Motive**

65. As set forth above, Ms. Morrison filed her Charge of Discrimination with the EEOC on January 12, 2025, alleging that her termination was the product of unlawful discrimination and retaliation.

66. On July 27, 2026, after Ms. Morrison had filed her Charge and waited for the agency to act on it, Anderson filed a lawsuit against the City and others in this Court, Anderson v. City of Philadelphia, et al., Civil Action No. 2:26-cv-05266 (E.D. Pa.) (the "Anderson Complaint").

67. Upon information and belief, as alleged in the Anderson Complaint, shortly after Anderson's hire as Chief DEI Officer in or about October 2024, Garrett-Harley instructed her to "document Celena [Morrison] out," directing her to build a case for Ms. Morrison's termination. (Anderson Compl. ¶ 49.)

68. Upon information and belief, as alleged in the Anderson Complaint, Anderson refused, making clear to Garrett-Harley that she would not participate in sex discrimination, harassment, or retaliation against Ms. Morrison.

69. Upon information and belief, as alleged in the Anderson Complaint, when Ms. Morrison later raised discrimination concerns to Anderson, Garrett-Harley accused Anderson of "betraying" her by relaying those complaints. (Anderson Compl. ¶ 51.)

70. Upon information and belief, as alleged in the Anderson Complaint, Garrett-Harley mocked Ms. Morrison during a meeting with Grady and a labor attorney, derisively remarking that Ms. Morrison used a "deep male tone" to intimidate staff. (Anderson Compl. ¶ 52.)

71. Ms. Morrison first learned of these allegations when the Anderson Complaint was filed, after she had already filed her own EEOC Charge.

72. The Anderson Complaint confirmed what Ms. Morrison had feared but could not previously substantiate: that Garrett-Harley and the City had targeted her for removal because of her gender identity and her advocacy on behalf of LGBTQ+ employees, and that this effort began in or shortly after October 2024, approximately one month before her termination and before any of the conduct the City would later cite as its stated reason for terminating her.

73. The foregoing establishes that Defendant City, acting through Garrett-Harley, sought Ms. Morrison's removal from the outset of Anderson's tenure as Ms. Morrison's supervisor, and that Garrett-Harley harbored direct animus toward Ms. Morrison because of her gender identity and her complaints of discrimination.

**Final Policymaking Authority**

74. At all relevant times, Mayor Cherelle Parker was the final policymaker for the City with respect to the personnel action at issue in this Complaint, the termination of Ms. Morrison's employment as Executive Director of the Mayor's Office of LGBT Affairs.

75. On information and belief, the decision to terminate Ms. Morrison was made, directed, or approved by Garrett-Harley, the Chief Deputy Mayor, was made or ratified by Mayor Parker, and was not subject to review by any other City official. Garrett-Harley was present at the November 21, 2024 meeting at which Ms. Morrison was informed of her termination without explanation, and the Mayor's view of Ms. Morrison's advocacy for the LGBTQ+ community had been conveyed to her by the Mayor's Chief of Staff, as set forth in paragraph 39 above.

76. Upon information and belief, Thurman, as the Mayor's Chief of Staff, participated in and influenced the decision to terminate Ms. Morrison, including through the negative statements about Ms. Morrison that she made in meetings of City leadership, as alleged in paragraph 47 above, and through her communication of the Mayor's view that Ms. Morrison's commitment to the LGBTQ+ community was a hindrance to the administration, as alleged in paragraph 39 above.

77. Upon information and belief, as alleged in the Anderson Complaint, Inspector General Alex DeSantis told Anderson in July 2025 that decisions about the outcome of an investigation and any resulting action would ultimately be up to Garrett-Harley and other leadership. (Anderson Compl. ¶ 69.)

**The City's Custom of Disregarding Discrimination Against Transgender and Non-Binary Employees**

78. Throughout the Parker administration, the City maintained a custom and practice of disregarding, and declining to remedy, discrimination and harassment directed at transgender and non-binary employees. That custom was so widespread and well settled within the Office of the Mayor that it carried the force of law.

79. The custom is reflected in the accusations that Ms. Morrison's office was "overstepping" when it supported transgender and non-binary employees (paragraph 37); the refusal of supervisors to provide the training Ms. Morrison requested, accompanied by statements that they were "not doing that they/them thing," and the exclusion of Ms. Morrison and DEI leadership from meetings (paragraph 38); Executive Order No. 13-24, which reduced the authority of the office charged with addressing these concerns (paragraph 43); the approximately fifteen to twenty reports of workplace discrimination that City employees across City departments made to Ms. Morrison's office during 2024 (paragraph 63); and the resignation of at least five employees because of the hostility they experienced (paragraph 64).

80. The City's Human Resources personnel, including Lonie and Grady, received Ms. Morrison's reports of harassment in November 2023, May 2024, and November 2024, as alleged in paragraphs 36, 42, 55, and 56 above. Upon information and belief, they conducted no investigation and took no corrective action in response to any of those reports.

81. Upon information and belief, the City's practice of avoiding putting personnel matters in writing, described to Ms. Morrison as the "head down model" (paragraph 40), permitted City

officials to take adverse action against employees who raised discrimination concerns without creating a documented record subject to review.

82. The City failed to train its supervisors, its Human Resources personnel, and the members of the Mayor's security detail regarding discrimination and harassment based on gender identity, the investigation of complaints of such conduct, and the confidentiality of an employee's transgender status. Ms. Morrison repeatedly requested that the City provide such training, and the City declined to do so.

83. The need for such training was obvious. Upon information and belief, City officials, including officials with final policymaking authority, had actual notice through Ms. Morrison's training requests, her reports of harassment, and the volume of discrimination reports received by her office that the absence of training was likely to result in violations of the constitutional rights of transgender and non-binary employees. The City's failure to act in the face of that notice reflects deliberate indifference to those rights.

**Stigmatizing Statements Accompanying the Termination**

84. In connection with Ms. Morrison's termination, the City, acting through Grady and Lonie, characterized Ms. Morrison's statement that she felt like "throwing it all away" as a "threat of violence," as alleged in paragraph 55 above. That characterization was false. Ms. Morrison made no threat of violence toward anyone.

85. The statements in the termination letter described in paragraph 60 above were likewise false. Together with the "threat of violence" characterization, those statements impugned Ms. Morrison's character, integrity, and fitness for leadership positions in public service.

86. Upon information and belief, the City made these statements public.

87. The City terminated Ms. Morrison's employment contemporaneously with these statements and did not offer or afford her a name-clearing hearing or any other opportunity to refute them.

88. As a result, Ms. Morrison's reputation in the public service and LGBTQ+ advocacy communities has been damaged, and her ability to obtain comparable employment has been impaired.

## DAMAGES

89. The discriminatory and retaliatory conduct of the City and the Individual Defendants, culminating in Ms. Morrison's termination, has resulted in significant damages to Ms. Morrison's reputation, her ability to obtain comparable employment, and her wellbeing.

90. Ms. Morrison is entitled to recover the wages and benefits she would have earned had she remained employed by the City, including backpay and front pay.

91. Ms. Morrison is also entitled to recover for damages to her reputation and the loss of future earnings caused by Defendants' wrongful conduct and the pretextual claim that Ms. Morrison's termination was based on her behavior, communication, and professionalism.

92. Ms. Morrison is further entitled to recover for the pain and suffering she has endured as a result of Defendants' actions. These injuries include mental anguish, anxiety, embarrassment, humiliation, sleeplessness, and emotional distress.

**COUNT I**
**Sex Discrimination (Including Gender Identity)**
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)**
**(Morrison v. City of Philadelphia)**

93. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

94. 42 U.S.C. § 2000e-2(a) provides that it shall be an unlawful employment practice for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

95. Ms. Morrison, a transgender woman, is a member of a protected class who was more than qualified for her position as Executive Director of the Mayor's Office of LGBT Affairs.

96. Ms. Morrison suffered adverse employment actions, including a hostile work environment and termination, because of her sex and gender identity.

97. The conduct described in paragraphs 50 through 54 above was unwelcome, occurred because of Ms. Morrison's sex and gender identity, was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment, and is imputable to Defendant because Defendant had actual notice of the conduct through Ms. Morrison's reports and failed to take prompt and effective remedial action.

98. Ms. Morrison's termination gives rise to an inference of discrimination whereas:

a. Defendant's stated reason for termination, that Ms. Morrison's behavior, communication, and professionalism did not consistently align with those of the

Administration, is unsupported by any documented performance deficiency and is pretextual;

b. Ms. Morrison was subjected to invasive questioning about her body and gender-affirming procedures, and her transgender status was disclosed without her consent, none of which was addressed or remedied by Defendant;

c. the City, acting through Garrett-Harley, sought to build a case for Ms. Morrison's termination approximately one month before she was terminated, motivated by animus toward her gender identity, as set forth in paragraphs 67 through 73 above; and

d. Ms. Morrison's termination followed directly on the heels of her renewed reports of discrimination and harassment, occurring one day after her written complaint to Human Resources.

99. As a direct and proximate result of Defendant's discriminatory treatment, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

100. Pursuant to Title VII, 42 U.S.C. § 2000e-5(k), Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant City of Philadelphia for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Defendant's discriminatory conduct, plus attorneys' fees and such reasonable costs as the Court may allow.

**COUNT II**
**Retaliation**

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)**
**(Morrison v. City of Philadelphia)**

101. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

102. 42 U.S.C. § 2000e-3(a) makes it unlawful for an employer to discriminate against any employee because that employee has opposed any practice made unlawful under Title VII.

103. Ms. Morrison engaged in activity protected under Title VII by reporting sexual harassment and gender identity–based discrimination to Defendant's Human Resources representatives, including her report to Lonie in or around May 2024, her repeated complaints of discrimination against transgender and non-binary employees and requests for training throughout the Parker administration, her statements during the November 19, 2024 meeting, and her written complaint of November 20, 2024.

104. Defendant had knowledge of Ms. Morrison's protected activity.

105. Ms. Morrison's termination gives rise to an inference of retaliation whereas:

a. Defendant terminated Ms. Morrison's employment on November 21, 2024, one day after she submitted a written complaint reiterating her allegations of discrimination and harassment; and

b. Defendant's stated reason for termination was pretextual and unsupported by any documented performance deficiency.

106. As a direct and proximate result of Defendant's retaliatory conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

107. Pursuant to Title VII, 42 U.S.C. § 2000e-5(k), Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant City of Philadelphia for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Defendant's retaliatory conduct, plus attorneys' fees and such reasonable costs as the Court may allow.

**COUNT III**
**42 U.S.C. § 1983: Equal Protection Clause**
**Individual Capacity Claim**
**(Morrison v. Garrett-Harley)**

108. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

109. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees Ms. Morrison the right to be free from intentional discrimination by state actors on the basis of her sex, including her gender identity.

110. 42 U.S.C. § 1983 provides a remedy against any person who, under color of state law, deprives another of rights secured by the Constitution.

111. Garrett-Harley, as Chief Deputy Mayor of the City of Philadelphia, acted under color of state law at all times relevant hereto.

112. Garrett-Harley personally participated in the discrimination directed at Ms. Morrison by, among other things, instructing Anderson to build a case for Ms. Morrison's termination because of her gender identity, by attending the November 21, 2024 meeting at which Ms. Morrison was terminated without explanation, and by mocking Ms. Morrison's gender identity and expression before other City officials.

113. Garrett-Harley's conduct was motivated by intentional discrimination against Ms. Morrison because of her sex and gender identity and was a proximate cause of Ms. Morrison's termination.

114. Garrett-Harley's conduct gives rise to an inference of discriminatory intent whereas:

a. Garrett-Harley directed that a case be built against Ms. Morrison for termination shortly after Anderson's hire, before any of the conduct later cited by the City as a basis for termination had occurred;

b. Garrett-Harley responded to Anderson's relaying of Ms. Morrison's discrimination complaints by accusing Anderson of "betraying" her, evincing hostility toward those complaints being taken seriously; and

c. Garrett-Harley personally mocked Ms. Morrison's gender identity and expression by derisively referring to her "deep male tone" in a meeting with Human Resources and a labor attorney, which is direct evidence of discriminatory animus.

115. Garrett-Harley's conduct was intentional, willful, and undertaken with malice or with reckless indifference to Ms. Morrison's federally protected rights, warranting an award of punitive damages against Garrett-Harley individually.

116. As a direct and proximate result of Garrett-Harley's conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

117. Pursuant to 42 U.S.C. § 1988, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant Garrett-Harley for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Garrett-Harley's conduct, together with punitive damages, attorneys' fees, and such reasonable costs as the Court may allow.

## COUNT IV
## 42 U.S.C. § 1983: Equal Protection Clause
## Individual Capacity Claim
## (Morrison v. Grady)

118. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

119. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees Ms. Morrison the right to be free from intentional discrimination by state actors on the basis of her sex, including her gender identity.

120. 42 U.S.C. § 1983 provides a remedy against any person who, under color of state law, deprives another of rights secured by the Constitution.

121. Grady, as Human Resources Manager for the City, acted under color of state law at all times relevant hereto.

122. Grady personally participated in the discrimination directed at Ms. Morrison, including by participating in the November 19, 2024 meeting in which Ms. Morrison was confronted about a mischaracterized "threat of violence" rather than having her reports of discrimination and harassment addressed, by attending the November 21, 2024 meeting at which Ms. Morrison was informed of her termination without any stated reason, and by signing the termination letter described in paragraph 60 above, which cited no documented performance deficiency, one day

after Ms. Morrison's written complaint of discrimination and harassment. Grady received Ms. Morrison's written complaint of November 20, 2024, which was addressed to her, and did not respond to it in writing. She instead telephoned Ms. Morrison that afternoon and directed her to a meeting at 9:00 a.m. the next morning, and on November 21, 2024 she signed the letter terminating Ms. Morrison's employment.

123. Grady's conduct was motivated by intentional discrimination against Ms. Morrison because of her sex and gender identity and was a proximate cause of Ms. Morrison's termination.

124. Grady's conduct was intentional, willful, and undertaken with malice or with reckless indifference to Ms. Morrison's federally protected rights, warranting an award of punitive damages against Grady individually.

125. As a direct and proximate result of Grady's conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

126. Pursuant to 42 U.S.C. § 1988, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant Grady for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Grady's conduct, together with punitive damages, attorneys' fees, and such reasonable costs as the Court may allow.

## COUNT V
## 42 U.S.C. § 1983: Equal Protection Clause

**Individual Capacity Claim**
**(Morrison v. Thurman)**

127. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

128. The Equal Protection Clause and 42 U.S.C. § 1983, as set forth in paragraphs 109 and 110 above, apply to Thurman, who acted under color of state law at all times relevant hereto as Chief of Staff to the Mayor.

129. Thurman personally participated in the discrimination directed at Ms. Morrison by communicating to her the Mayor's view that her commitment to the LGBTQ+ community was a hindrance to the administration, by speaking negatively about her in meetings of City leadership while she was raising concerns about discrimination against transgender and non-binary employees, and, upon information and belief, by participating in and influencing the decision to terminate her employment, as alleged in paragraphs 39, 47, and 76 above.

130. Thurman's conduct was motivated by intentional discrimination against Ms. Morrison because of her sex and gender identity and was a proximate cause of Ms. Morrison's termination.

131. Thurman's conduct was intentional, willful, and undertaken with malice or with reckless indifference to Ms. Morrison's federally protected rights, warranting an award of punitive damages against Thurman individually.

132. As a direct and proximate result of Thurman's conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

133. Pursuant to 42 U.S.C. § 1988, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant Thurman for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Thurman's conduct, together with punitive damages, attorneys' fees, and such reasonable costs as the Court may allow.

**COUNT VI**
**42 U.S.C. § 1983: Equal Protection Clause**
**Individual Capacity Claim**
**(Morrison v. Lonie)**

134. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

135. The Equal Protection Clause and 42 U.S.C. § 1983, as set forth in paragraphs 109 and 110 above, apply to Lonie, who acted under color of state law at all times relevant hereto as the Mayor's Office Human Resources representative and later as Director of Administrative Services.

136. As the Human Resources representative and primary contact for employees in the Mayor's Office, Lonie had the authority and the responsibility to investigate and remedy harassment reported to her.

137. Lonie had actual knowledge of the sex-based harassment directed at Ms. Morrison through Ms. Morrison's reports in November 2023 and May 2024, her statements at the November 19, 2024 meeting, and her written complaint of November 20, 2024, on which Lonie was copied, as alleged in paragraphs 36, 42, 55, and 56 above.

138. Lonie acquiesced in, and was deliberately indifferent to, that harassment. Upon information and belief, she conducted no investigation, took no step to protect Ms. Morrison, and took no corrective action in response to any of Ms. Morrison's reports. On November 19, 2024, Lonie

joined Grady in confronting Ms. Morrison about a mischaracterized “threat of violence,” two days before the City terminated her employment.

139. Lonie’s conduct was motivated by intentional discrimination against Ms. Morrison because of her sex and gender identity and was a proximate cause of the hostile work environment Ms. Morrison endured and of her termination.

140. Lonie’s conduct was intentional, willful, and undertaken with malice or with reckless indifference to Ms. Morrison’s federally protected rights, warranting an award of punitive damages against Lonie individually.

141. As a direct and proximate result of Lonie’s conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

142. Pursuant to 42 U.S.C. § 1988, Ms. Morrison demands attorneys’ fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant Lonie for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Lonie’s conduct, together with punitive damages, attorneys’ fees, and such reasonable costs as the Court may allow.

## COUNT VII
## 42 U.S.C. § 1983: Municipal Liability
## Final Policymaker, Custom, and Failure to Train Theories
## (Morrison v. City of Philadelphia)

143. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

144. A municipality may be held liable under 42 U.S.C. § 1983 where the constitutional violation alleged was caused by an official who possessed final, non-reviewable policymaking authority over the decision at issue, without any requirement to establish a broader pattern or practice of similar violations.

145. As alleged in paragraphs 74 through 77 above, Mayor Parker, and in the alternative Garrett-Harley and/or Grady, possessed final policymaking authority on behalf of the City over the decision to terminate Ms. Morrison's employment.

146. Because that decision was made, directed, or ratified by an official with final policymaking authority, the termination of Ms. Morrison's employment constitutes an act of official policy of the City.

147. The City's termination of Ms. Morrison's employment, through its final policymaker(s), was motivated by intentional discrimination against her because of her sex and gender identity, and was a proximate cause of the injuries alleged herein.

148. Upon information and belief, Mayor Parker and Garrett-Harley approved the decision to terminate Ms. Morrison, and the stated basis for it, with knowledge of her written complaint of November 20, 2024, and thereby ratified the conduct of their subordinates.

149. In the alternative, the violations of Ms. Morrison's constitutional rights were caused by the City's custom of disregarding, and declining to remedy, discrimination and harassment against transgender and non-binary employees, as alleged in paragraphs 78 through 81 above. Upon information and belief, City policymakers knew of and acquiesced in that custom, which was the moving force behind the harassment Ms. Morrison endured and her termination.

150. In the further alternative, the City's failure to train its supervisors, Human Resources personnel, and security personnel, as alleged in paragraphs 82 and 83 above, amounted to deliberate indifference to the rights of transgender and non-binary employees and was the moving force behind the violations of Ms. Morrison's rights.

151. As a direct and proximate result of the City's conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

152. Pursuant to 42 U.S.C. § 1988, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant City of Philadelphia for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of the City's conduct, together with attorneys' fees and such reasonable costs as the Court may allow.

**COUNT VIII**
**Sex Discrimination (Including Gender Identity)**
**Violation of the Pennsylvania Human Relations Act, 43 P.S. § 955(a)**
**(Morrison v. City of Philadelphia)**

153. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

154. The PHRA, 43 P.S. § 955(a), provides that it shall be an unlawful discriminatory practice "for any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability... of any individual... to bar or to discharge from employment such individual... or to otherwise discriminate against such individual... with respect to compensation, hire, tenure, terms, conditions or privileges of employment."

155. Ms. Morrison, a transgender woman, is a member of a protected class who was more than qualified for her position as Executive Director of the Mayor's Office of LGBT Affairs.

156. Ms. Morrison suffered adverse employment actions, including a hostile work environment and termination, because of her sex and gender identity, for the same reasons set forth in Count I above.

157. Ms. Morrison hereby makes a claim against Defendant City under the Pennsylvania Human Relations Act.

158. As a direct and proximate result of Defendant's discriminatory treatment, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

159. Pursuant to the PHRA, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant City of Philadelphia for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Defendant's discriminatory conduct, plus attorneys' fees and such reasonable costs as the Court may allow.

**COUNT IX**
**Retaliation**
**Violation of the Pennsylvania Human Relations Act, 43 P.S. § 955(d)**
**(Morrison v. City of Philadelphia)**

160. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

161. The PHRA, 43 P.S. § 955(d), makes it unlawful for any person to discriminate against any individual because that individual has opposed any practice forbidden by the PHRA.

162. Ms. Morrison engaged in protected activity under the PHRA for the same reasons set forth in Count II above, and Defendant retaliated against her by terminating her employment.

163. As a direct and proximate result of Defendant's retaliatory conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

164. Pursuant to the PHRA, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendant City of Philadelphia for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of Defendant's retaliatory conduct, plus attorneys' fees and such reasonable costs as the Court may allow.

**COUNT X**
**Aiding and Abetting**
**Violation of the Pennsylvania Human Relations Act, 43 P.S. § 955(e)**
**(Morrison v. Garrett-Harley, Grady, Thurman, and Lonie)**

165. Ms. Morrison incorporates by reference the preceding paragraphs as though set forth fully herein.

166. The PHRA, 43 P.S. § 955(e), makes it an unlawful discriminatory practice "[f]or any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice."

167. The City engaged in unlawful discriminatory practices under Sections 5(a) and 5(d) of the PHRA, as set forth in Counts VIII and IX above.

168. Garrett-Harley aided and abetted those practices by directing that a case be built for Ms. Morrison's termination, by participating in the decision to terminate her, and by attending the meeting at which she was terminated, as alleged in paragraphs 58, 67, and 75 above.

169. Grady aided and abetted those practices by recasting Ms. Morrison's reports of discrimination as a "threat of violence," by declining to respond to her written complaint of November 20, 2024, and by executing her termination one day later, as alleged in paragraphs 55 through 60 above.

170. Thurman aided and abetted those practices by the conduct alleged in paragraphs 39, 47, and 76 above.

171. Lonie aided and abetted those practices by failing to investigate or remedy the harassment reported to her despite her responsibility to do so, and by participating in the November 19, 2024 meeting, as alleged in paragraphs 36, 42, 55, and 56 above.

172. As a direct and proximate result of the Individual Defendants' conduct, Ms. Morrison suffered and continues to suffer emotional distress, mental anguish, embarrassment, anxiety, and monetary damages including loss of future earnings.

173. Pursuant to the PHRA, Ms. Morrison demands attorneys' fees and court costs.

**WHEREFORE,** Ms. Morrison demands judgment against Defendants Garrett-Harley, Grady, Thurman, and Lonie for all damages and losses incurred, or to be incurred, by Ms. Morrison as a result of their conduct, plus attorneys' fees and such reasonable costs as the Court may allow.

## JURY TRIAL DEMAND

Ms. Morrison hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC**

By: *<u>/s/ Zainab K. Shields</u>*

Zainab K. Shields, Esquire (PA I.D. No. 321181)
Riley H. Ross III, Esquire (PA I.D. No. 204676)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-587-0006
Fax: 215-587-0628
zainab@minceyfitzross.com
riley@minceyfitzross.com

Date: October 22, 2026

Attorneys for Celena Morrison